In the Matter of RALPH BOWEN et al., Respondents, v. JAMES E. ALLEN, JR., as Commissioner of Education of the State of New York, Appellant, and STATE UNIVERSITY OF NEW YORK, Intervenor-Respondent-Appellant.

Third Department, July 13, 1962.

*Charles A. Brind, Jr.* (*John P. Jehu, Elizabeth M. Eastman, George B. Farrington* and *Louis H. J. Welch* of counsel), for appellant.

*Patricia Eames* for respondents.

*John C. Crary, Jr.,* for intervenor-respondent-appellant.

BERGAN, P. J. Petitioners were employed on the teaching staff in the field of social science at State University College of Long Island in 1957 at the time of the organization of the college and were members of its initial teaching personnel. They had understood from conversations with the dean and from the policies and practices followed at the college that their appointments were permanent; or at least that they were for a term not ending before 1960.

In the early Summer of 1959 each petitioner was advised by the dean that his appointment would not be renewed; the reasons are not altogether clear in the record. The dean seems to have felt petitioners were part of some academic " faction ". In a memorandum addressed to one of petitioners he used the expression " identified with either of the factions manifestly present within the Division "; and other papers in the record suggest that differences of opinion had arisen within the college as to recruitment of new teaching staff and the scope and content of courses.

There are implications in the record that " factionalism " existed between those who belonged to and those who did not belong to the " Chicago members " of the social science division. There is an assertion in the record that the dean's administration evolved selection of personnel which caused " heavy weighting in favor of the Chicago system ".

Upon protesting the discontinuance of their appointments to the dean, the petitioners were referred to the vice-president of the State University; upon communicating with him they were advised he regarded the dean's action as " procedurally correct " and referred petitioners to the president of the State University, who also advised petitioners he was of opinion that the dean's action had been " procedurally correct and reasonable ".

Thereupon petitioners appealed to the State Commissioner of Education, invoking his appellate jurisdiction in school matters under section 310 of the Education Law. The Commissioner ruled he was without appellate jurisdiction in a dispute within the State University and declined to entertain the appeal.

Petitioners then instituted this article 78 proceeding to compel the Commissioner to take jurisdiction. The court at Special Term has directed the Commissioner to " examine and decide the Petitioners' appeal with all convenient speed ". The Com-

missioner has appealed; and this court has allowed the State University to intervene as a party.

The proceeding, accordingly, raises the significant public issue of the appellate jurisdiction of the Commissioner of Education to determine a controversy within or concerning the State University of New York. Both the Commissioner and the State University agree no such jurisdiction exists. Petitioners, arguing for affirmance of the order at Special Term, contend the Commissioner has jurisdiction and that it must be exercised.

The answer to be given depends on a reading of the words of the statute in the light of history and of judicial and administrative construction.

Section 310 contains this pertinent clause: " Any person conceiving himself aggrieved may appeal or petition to the commissioner of education who is hereby authorized and required to examine and decide the same ". The section further provides that " [s]uch appeal or petition may be made in consequence of any action: " and there follow seven enumerated paragraphs. The first six plainly are concerned with the common schools. The seventh, which is crucial in this case is: " 7. By any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools."

The words " any other " following in line after an enumeration of things or classes of things, are commonly regarded as relating to similar things or classes if the meaning intended is otherwise obscure or doubtful. Here, it will be noticed, the words " any other " appear three times in subdivision 7 and each time seem to relate to the enumerations in the preceding six subdivisions of the section concerned with the common schools under the rule of *ejusdem generis*.

Although, the clause " concerning any other matter under this chapter " could literally, and if it stood alone, embrace much more than the common school classifications of the first six subdivisions, the words " concerning any other matter under this chapter " do not stand alone, and words are circumscribed and modified by the contextual words which precede and follow them. The effective preceding words are " any other official act or decision * * * or meetings concerning " any other matter under this chapter.

The first and second " any other " are thus tightly linked, at once together, and to the preceding subdivisions. The first literally touches acts (including decisions and meetings) and the second touches subject matter with which those acts are

concerned. It would be expected one would be as broad or as narrow in scope as the other. Thus the first "any other" would tend to limit the second one to the kinds of things enumerated in the first six; since manifestly they deal successively with acts and then subject matter.

Even if the second "any other" is to be deemed greatly broadened by "matter under this chapter", an ambiguity would result; but this ambiguity upon such a construction tends to be resolved by the last clause in immediate context: " or any other act pertaining to common schools ", which makes it reasonably clear that the draftsman, in the preceding words concerning other acts and other subject matter, was dealing throughout with the common schools.

In *People ex rel. Hylan* v. *Finegan* (227 N. Y. 219, 225) the language of subdivision 7 of section 310 (then § 890) was construed to relate to the prior six subdivisions and " so construed is not any broader in the ultimate test than they ". The controversy there was with municipal authorities outside the jurisdiction of the Commissioner and hence the decision is not precisely in point; but the reading together of the subdivisions as being interrelated seems significant upon the question of construction now before us. The decision in *Matter of Board of Educ. of City of N. Y.* v. *Cole* (176 Misc. 297, affd. 263 App. Div. 777, affd. 288 N. Y. 607) concerned an agency which by statute had been expressly made " part of the common school system " (former Education Law, § 1143, now § 6202).

If there were more doubt about this than our rationalization suggests, the history of the statute and its construction by officers charged with its administration seem to support the rationalization. The statutory predecessors of section 310 trace back well over a century and manifestly were intended to vest in the highest State administrative officer of the public schools an appellate jurisdiction, judicial in some of its characteristics, over controversies within the common school system.

The Consolidated School Law of 1894 (ch. 556) for example gave the former State Superintendent of Public Instruction jurisdiction to hear appeals as to certain stated common school matters and any other matter " under this act, or any other act pertaining to common schools " (tit. XIV, § 1, subd. 7). This predecessor statute was cast in substantially the same language as present section 310 and tends to account for the structure and form of language presently employed. Specifically all three " any other " clauses were there in a concluding subdivision 7 and in substantially similar context.

In 1904 when the office of the Commissioner of Education was created these appellate powers relating to common schools were transferred to him. In *People ex rel. Walrath* v. *O'Brien* (112 App. Div. 97, 98) which construed the 1904 statute, it was noted that appeals to the Commissioner were to be taken " in the same cases " in which they were formerly taken to the Superintendent.

When on the consolidation and enactment of the Education Law in 1909 (L. 1909, ch. 21, § 360) and 1910 (L. 1910, ch. 140, § 880) the powers of the Commissioner were transferred to this statute, it became sensible as part of a catch-all revision to substitute " this chapter " for " this act " but there is no suggestion from any contemporary study or report that the appellate powers of the Commissioner were intended in 1909 and 1910 to embrace more than the affairs of the common schools. Indeed, most of the " chapter ", then and now, is concerned with matters in the department of which the Commissioner is administrative head and an appellate quasi-judicial jurisdiction, rational enough in common school controversies, would become incongruous in other areas within the department.

No doubt the Commissioner's administrative power in the area of higher education was broader in the past than it now seems to be over the State University. The statute which established the Commissioner's office (L. 1904, ch. 40) extended his powers to higher education (§ 4). In 1927 the University of the State of New York was merged into the Education Department of which the Commissioner is the administrative head (L. 1927, ch. 153, § 1, now § 101) and the Commissioner specifically was given supervisory power of the State Teachers' Colleges (§ 305, subds. 2, 4).

The State University was created by the Legislature in 1948 (ch. 695) and provision for its administration was made by article 8 of the Education Law. It is governed by a Board of Trustees (§ 353). The only specific function assigned to the Commissioner by article 8 is that " at least one of the executive officers " of the State University shall be a designee of the Commissioner (§ 353, subd. 3). This is for a stated purpose, i.e. " in order to coordinate planning functions of the board [of trustees of State University] with those of the state education department ".

All this strongly suggests the administrative independence of the State University from control by the Commissioner of Education even though the general powers of the Commissioner in the area of higher education (art. 7) were not expressly withdrawn by the 1948 statute. Whatever administrative power may

exist, if any, it is enough for the purposes of the case before us to determine that the Commissioner has no appellate and judicial powers over controversies within the State University.

The order should be reversed and the petition dismissed, without costs.

GIBSON, HERLIHY and REYNOLDS, JJ., concur.

Order reversed and petition dismissed, without costs.